## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MAUSEAN Q.V. CARTER,

    Plaintiff,

    v.

BRADLEY BUTLER, *Assistant Warden*,
LT. EDWARD DAVIS,
LT. CURRAN McKENZIE,
SGT. GARRET LEWIS,
SGT. BRANT RICE, *Correctional Officer II*,
ALICIA CARTWRIGHT,
*Correctional Officer II ARP Coordinator*,
B. GREISE, *Correctional Officer II*,
JOHN MOST, *Correctional Officer II*,
DARYL LAVIN, *Correctional Officer II*,
VINCENT LARK, *Correctional Officer II*,
DAVID ROBEY, *Correctional Officer II*, and
JOHN AND JANE DOE OFFICERS,

    Defendants.

Civil Action No. 24-0902-TDC

## MEMORANDUM OPINION

Self-represented Plaintiff Mausean Q.V. Carter, an inmate currently confined at the Jessup

Correctional Institution ("JCI") in Jessup, Maryland and formerly confined at the Western

Correctional Institution ("WCI") in Cumberland, Maryland, has filed this civil rights action

pursuant to 42 U.S.C. § 1983 alleging that while he was at WCI, Defendants Assistant Warden

Bradley Butler, ARP Coordinator Alicia Cartwright, Lt. Edward Davis, Lt. Curran McKenzie, Sgt.

Garret Lewis, Sgt. Brant Rice, Correctional Officer II B. Greise, Correctional Officer II John Most,

Correctional Officer II Daryl Lavin, Correctional Officer II Vincent Lark, Correctional Officer II

David Robey, and other unidentified correctional officers referred to as John and Jane Doe Officers

(collectively, "J. Doe Officers") failed to protect him from assaults by other inmates. Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, which Carter opposes. Carter has filed a Motion for a Preliminary Injunction, a Motion to Compel Defendants to Comply with Federal Rule of Civil Procedure 5, and a Motion for Appointment of Counsel. Defendants have filed a memorandum in opposition to Carter's Motion for a Preliminary Injunction, as well as a Motion for an Extension of Time to file that brief, which will be granted. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Carter's Motion for a Preliminary Injunction will be DENIED, and Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    The August 16, 2021 Incident

On August 16, 2021, Carter was assigned to a cell in the B-wing of Housing Unit 3 ("HU3") at WCI which he shared with his cellmate, Adam Francis. At approximately 5:45 p.m., Carter and Francis were subjected to a cell search conducted by Sgt. Lewis, Officer Most, and Officer Greise. During the cell search, Francis was found to be in possession of a weapon and was then escorted to lock-up and charged with a disciplinary violation. According to Carter, during the cell search, other inmates on the housing tier began calling out that he was a snitch and making threats of violence against him. Carter also alleges that Sgt. Lewis was present at the time and went to various cells and talked to the inmates who were calling him a snitch.

Carter asserts that he then asked Sgt. Lewis, in the presence of Officers Most and Greise, to be allowed to speak with a lieutenant and to be provided with a form with which to file an administrative remedy procedure complaint ("ARP") so that he could report this potential threat

2

to his safety.  According to WCI reports submitted by Defendants, both Officer Most and Officer Greise have denied hearing other inmates call Carter a snitch during the cell search.  Defendants have also submitted a declaration from Officer Most in which he states that after the weapon was found, he was no longer monitoring HU3.

Carter further alleges that between 6:00 p.m. and 7:00 p.m. that same day, while Sgt. Lewis, Officer Most, Officer Greise, and other unidentified officers were monitoring evening recreation movement, his cell door was opened.  According to Carter, various inmates began confronting him, making threats, and calling him a snitch.  He further asserts that he was assaulted by an inmate while he was in front of his cell, and that Sgt. Lewis, Officer Most, Officer Greise, and the other officers could see the assault from their monitoring post, but none of them intervened or called a "code" to report an assault or fight.  Am. Compl. at 6, ECF No. 9.  Later, while Carter was in the dayroom, he was assaulted a second time by the same inmate while Sgt. Lewis, Officer Most, and Officer Greise were at their post monitoring the dayroom, but none of them intervened.

Sometime after 7:00 p.m., Carter again asked Sgt. Lewis for an ARP form and to speak to a lieutenant to report the assault and the threat to his safety caused by inmates calling him a snitch. Sgt. Lewis denied the request.  According to a declaration by Sgt. Lewis submitted with Defendants' Motion, on August 16, 2021 Carter did not tell him that he feared for his safety.  Sgt. Lewis asserts that inmates in HU3 could obtain an ARP form through an inmate tier representative or from any WCI employee.  According to the submitted declaration of Lt. Davis, inmates could communicate with a lieutenant by using a drop box in the housing unit.

Carter alleges that the next day, on August 17, 2021, WCI was on lock-down for "RAD day."  *Id.*  That day, he continued making requests to Sgt. Lewis and other correctional officers to be allowed to speak to the supervisor, who at the time was Lt. McKenzie, and to be provided with

3

an ARP form to report the assaults and threats, but his requests were denied. Carter further asserts that between 8:30 p.m. and 9:30 p.m. that evening, Sgt. Lewis, Officer Lavin, and a J. Doe Officer came to his cell, handcuffed him, and escorted him out. Carter acknowledges that he had marks on his body "consistent with an assault," *id.* at 7, and Sgt. Lewis has stated that he observed signs that Carter and other inmates had been fighting and thus detained them and issued violation notices to them. Carter declined to make a statement about the incident and was taken to the medical unit but declined medical treatment. According to Carter, he again requested to speak to the lieutenant and to receive an ARP form, but Sgt. Lewis declined. Carter was then placed on administrative segregation in Housing Unit 4 ("HU4").

Once in HU4, Carter asked Sgt. J. Tichi if he could speak to a supervisor and for an ARP form in order to report the two assaults and the threat based on being called a snitch. Sgt. Tichi provided Carter with an ARP form, which he completed by reporting the events of August 16, 2021 and submitted as ARP No. WCI-1377-21. According to Carter, Assistant Warden Butler and ARP Coordinator Alicia Cartwright did not contact him regarding this "emergency ARP" for 21 days, and the ARP was denied by Assistant Warden Butler on September 7, 2021. *Id.* at 8. Carter further asserts that he appealed this denial to the Commissioner of Correction, and that in November 2021, the Commissioner found that Warden Butler and ARP Coordinator Cartwright did not properly investigate and process his ARPs. According to ARP records submitted by Defendants, however, the Commissioner dismissed the appeal on October 5, 2021 on the grounds that the warden had fully addressed his complaint.

## II.    The August 25, 2021 Incident

Carter remained on administrative segregation in HU4 until August 24, 2021, when the violation notice for fighting was dismissed. When Carter was told by Officer Lark to report to

4

HU3 for his new cell assignment, he told Officer Lark that there was a serious threat of harm to him in HU3 because he had been called a snitch while there, and he asked if he could be sent to a different housing unit. Officer Lark told him that he could not change the assignment and that the only way Carter could avoid HU3 was if he "kick[ed] the tote," which Carter understood to mean that he would have to refuse the assignment, receive a violation notice, and go back to segregation. *Id.* Carter informed Officer Lark that he was not taking those steps and thus reported to HU3.

When Carter arrived at HU3, on four occasions, he repeated his safety concerns to a John Doe Officer, asked if he could be moved to a different housing unit, asked for an ARP form, and asked to speak to a supervisor. The officer denied his requests and assigned him to a top bunk in a cell. Carter then asked for a bottom bunk based on a medical order for assignment to a bottom bunk only and asked to speak to Lt. McKenzie, but the John Doe Officer denied his requests. Carter asserts that later that evening, Sgt. Lewis told him there that were inmates on the tier who were not happy to see that Carter had returned to the housing unit. Although Carter also asked Sgt. Lewis for an ARP form to report his safety concerns and to be moved to another housing unit, Sgt. Lewis told him, "There's nowhere to move you. I'm just giving you a heads up, watch your back." *Id.* at 9.

Carter asserts that at the correctional staff shift change at 12:00 midnight, he renewed his efforts to speak with a supervisor and obtain an ARP form, but his requests went unaddressed. The next morning, on August 25, 2021 at 8:00 a.m., Carter asked Officer Robey and a John Doe Officer if he could be removed from HU3 because of a threat to his safety, but his request went unaddressed.

According to Carter, he was not scheduled for recreation on the morning of August 25, 2021, but his cell door was opened contrary to the practice of leaving it locked under those

5

circumstances. Specifically, Carter asserts that at 9:15 a.m., several inmates were congregating around his cell door when Officer Robey and the John Doe Officer called for his cell door to be opened. When Carter's door opened, an inmate attempted to force his way through the doorway while stabbing Carter. Carter pushed his way out of the cell, despite sustaining stab wounds, and began heading toward Officer Robey and the John Doe Officer, who were standing at the tier entrance monitoring the area. Carter alleges that as he called for help, the officers looked in the opposite direction. *Id.* He further claims that neither officer called a code to report a fight in the tier. Carter also asserts that as he tried to move away from his cell, another inmate attempted to block him from getting away, and that because Officer Robey and the other officer refused to call a code, the inmate who had initially stabbed him was able to approach Carter from behind and stab him again. Carter recalls that he was losing blood and becoming light-headed, and that he was eventually handcuffed and taken to the medical unit by Officer D. Hendrick and Sgt. Rice. Carter believes that his assailant was another inmate with whom Sgt. Lewis had communicated on August 16, 2021, during the time that his cell was searched and Carter was called a snitch.

According to an incident report submitted by Defendants, Carter's cell door was opened on August 25, 2021 when all cell doors on HU3 were opened for inmates to go receive their medication. At approximately 9:15 am, Willie Cox, an inmate who was waiting by Carter's door, pulled from his waistband what appeared to be a homemade weapon and entered Carter's cell. A few seconds later, Carter and Cox left the cell. As Carter started walking down the tier, he appeared to attack another inmate, Richard Owens, who responded by punching back. A code for fighting was then called by Officer Robey. Cox then caught up to Carter and stabbed him multiple times in the head and back. As Carter and Cox were ordered to stop fighting, Officer Robey handcuffed Carter. Carter was taken by ambulance to an outside hospital for treatment of his stab wounds. In

6

a declaration submitted by Defendants, Officer Robey asserts that he was in the lobby of the tier when the incident began and responded while it was in progress. According to Defendants, none of them other than Officer Robey were working in HU3 when Carter was stabbed on August 25, 2021. Carter, however, asserts that Lt. McKenzie was the supervisor for Officer Robey and the other correctional officers who had control of the panel that opened and closed the cell doors in HU3. He also alleges that Defendants "collectively disregarded [his] previous alerts of a serious threat" to his life, which resulted in the two assaults. *Id.* at 10. Carter asserts that in addition to his physical injuries, he suffers from psychological injuries such as nightmares, sleep disturbances, and paranoia.

## III.    Personal Property

Carter also asserts that while he was at an outside hospital receiving medical treatment following the August 25, 2021 assault, two John Doe Officers, under the supervision of Lt. McKenzie, packed up his personal property in a way that caused damage to or the loss of certain property. Although he submitted ARPs with his property claims and provided receipts for his property, he asserts that Assistant Warden Butler and ARP Coordinator Cartwright refused to accept his receipts, and his ARPs and complaints filed with the Inmate Grievance Office ("IGO") were dismissed. Carter sought judicial review in the Circuit Court for Anne Arundel County, Maryland, which determined that the IGO had improperly dismissed his claim and referred the case for an administrative hearing. Carter alleges that he was deprived of his property for over 934 days.

## IV.    The Complaint

In the presently operative Amended Complaint, Carter asserts in Counts 1, 2, and 3 that his right under the First Amendment to the United States Constitution to petition for redress of

7

grievances, his Eighth Amendment right to remain free from cruel and unusual punishment, and his Fourteenth Amendment rights to due process and equal protection of the law were violated when Defendants failed to respond to his requests to report a threat to his safety, failed to provide safer housing and otherwise protect him from the assaults by other inmates on August 16 and 25, 2021, and issued retaliatory tickets.

In Counts 4, 5, 6, and 7, Carter alleges violations of his rights under the First Amendment, the Fifth Amendment, the Eighth Amendment, and the Equal Protection Clause of the Fourteenth Amendment by Defendants Butler, McKenzie, Cartwright and J. Doe Officers based on the loss of his personal property.

As relief, Carter seeks monetary damages and an injunction requiring his assignment to a single cell for the duration of his prison sentence.

## DISCUSSION

### I.    Motion for a Preliminary Injunction

Carter has filed a Motion for a Preliminary Injunction in which he seeks an order barring any prison from placing him in a cell with another inmate.  He asserts that he is currently designated to a single cell at JCI because of the mental health symptoms he claims to suffer from as a result of the assaults at WCI.  He describes his mental health conditions as "uncontrollable" and asserts that his symptoms will disturb others and create a dangerous housing situation for both Carter and any potential cellmates.  Mot. Prelim. Inj. at 1, ECF No. 28.

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum*

8

*Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Defendants assert that this Motion is moot because, as stated in a declaration by the JCI Chief of Security, Carter currently has single-cell status at JCI, he has not had a cellmate since February 8, 2022, and there are no immediate plans to change that status. However, single-cell assignments are reviewed on an as-needed basis and depend in part on the housing needs of the facility.

Where there is no firm commitment that Carter will always have a single cell, the Court does not find that the Motion is moot. However, in light of the facts about Carter's present housing status, particularly that he has been in a single cell for over three years and there are no present plans to change that status, the Court finds that Carter has not demonstrated likely irreparable harm in the absence of a preliminary injunction. Moreover, in light of the lack of any imminent risk of harm, the balance of the equities and the public interest weigh against a preliminary injunction. *See Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994) (in vacating a preliminary injunction relating to prison operations, stating that "absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities"); *see also Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 126 (1977) (stating that courts should give "wide-ranging deference to . . . the decisions of prison administrators"); *Sandin v. Conner*, 515 U.S. 472, 482–83 (1995) (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment" in

prisons). Where Carter has not satisfied multiple prongs, the Motion for a Preliminary Injunction will be denied.

## II.    Motion to Dismiss or, in the Alternative, for Summary Judgment

In their Motion to Dismiss or, in the Alternative, for Summary Judgment, Defendants assert that the claims against them should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), or that summary judgment should be granted in their favor pursuant to Rule 56, because (1) Carter has not sufficiently alleged their personal participation in the alleged constitutional violations; (2) the record does not support the claim that Defendants violated the Eighth Amendment by failing to protect Carter from the assaults; (3) Carter has failed to state valid constitutional claims based on the deprivation of his personal property; and (4) Defendants are entitled to qualified immunity.    Carter opposes Defendants' Motion and also asserts that consideration of the Motion as a motion for summary judgment is premature because he requires discovery before such a motion can be considered. *See* Fed. R. Civ. P. 56(d).

### A.    Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* A court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). A self-represented party's complaint must be construed liberally. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, "liberal construction does not

10

mean overlooking the pleading requirements under the Federal Rules of Civil Procedure." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Thus, the Court may consider ARP No. WCI-1377-21, submitted by Carter on August 17, 2021, which is listed as an exhibit to the Amended Complaint. With their Motion, however, Defendants have submitted multiple additional exhibits, including declarations, incident reports, and a video of part of the August 25, 2021 incident. Rule 12(d) requires courts to treat such a motion to dismiss as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

The notice requirement has been satisfied by the title of Defendants' Motion. As to the second requirement, however, Carter has submitted a declaration pursuant to Rule 56(d) in which he asserts that he needs discovery in order to oppose a motion for summary judgment. Such discovery could include additional documents, videos, and depositions of Defendants on issues such as the full names and titles of the John Doe Officers and other officers referenced in the Amended Complaint; whether they were aware of Carter's requests for ARP forms and to report to a supervisor that he was subjected to physical threats; whether any codes were called when

11

Carter was stabbed and if not, the reason for the failure to do so; Defendants' knowledge of prior incidents of inmate-on-inmate violence; and WCI policies regarding permissible actions when an inmate alerts prison officials to a potential threat of harm. Although Defendants point to the video of the August 25, 2021 incident, that video is inconclusive, and the fact that they claim that there are no additional videos increases, rather than decreases, the need for discovery of other forms of evidence.

Where the record presently consists primarily of declarations and records specifically selected by Defendants for submission, and where Carter has identified relevant information that he should properly be permitted to seek in discovery, the Court finds that Carter has made the requisite showing that he needs discovery before he can properly oppose a motion for summary judgment. The Court will therefore treat the Motion as a Motion to Dismiss only and will consider only the Amended Complaint and its attachments.

### B.     Counts 1-3: Failure to Protect Claims

In Counts 1, 2, and 3, Carter asserts claims under the First, Eighth, and Fourteenth Amendments arising from the failure to respond to Carter's requests to report a threat to his safety through an ARP form or to a supervisor, and the failure to protect him from that threat by moving him out of HU3 before the assaults against him.

#### 1.     Eighth Amendment

Based on the allegations in the Amended Complaint, Carter's primary claim is the Eighth Amendment claim in Count 2 for a failure to protect him from a serious threat to inmate health and safety.

The Eighth Amendment to the United States Constitution protects prison inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. Though an Eighth Amendment claim

12

could arise from a failure to protect an inmate from an assault by another inmate, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or a substantial risk of such an injury. *Id.* (quoting *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014)). Subjectively, the prisoner must establish that the prison officials exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). Such deliberate indifference exists if there was a substantial risk of serious harm that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and the prison official in question had been exposed to that information but did not reasonably respond to it. *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016). Deliberate indifference also exists when prison officials were "aware that the plaintiff inmate face[d] a serious danger to his safety and they could avert the danger easily yet they fail[ed] to do so." *Id.* Where prison officials respond reasonably to the risk, they are not liable even if the harm was not ultimately averted. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Here, Carter has alleged that he notified certain Defendants that he believed he faced a risk to his personal safety when, during and after the August 16, 2021 cell search, other inmates in HU3 began "yelling out" that he was "a snitch" and made "threats of violence" to him in the presence of Sgt. Lewis, Officer Most, and Officer Greise, who were searching the cell. Am. Compl. at 6. He asserts that Sgt. Lewis went to other cells and talked to some of the inmates calling him a snitch. Although he asked Sgt. Lewis if he could speak to a supervisor or receive an ARP form

with which to report the threat to his safety, Sgt. Lewis denied those requests. He also alleges that later that evening, he was assaulted twice by one of the inmates who had called him a snitch, and that Sgt. Lewis, Officers Most and Greise, and other J. Doe Officers observed the assaults from their posts monitoring the tier but did not intervene or call a code to report an assault. Where he has alleged that these officers were aware of a threat to his safety but took no action to address the threat, that he in fact was assaulted, and that they failed to intervene upon observing the assault, Carter has stated an Eighth Amendment failure-to-protect claim against Sgt. Lewis, Officer Most, Officer Greise, and the J. Doe Officers.

As to the August 25, 2021 assault, Carter has alleged in the Amended Complaint that after he was moved to segregation, he informed certain Defendants that he faced a threat to his safety if he was returned to HU3 based on the labeling of him as a snitch, yet he was returned there and suffered an assault that resulted in 12 stab wounds. Specifically, on August 17, 2021, he told Sgt. Lewis and Officer Lavin about the threat when he again asked for an ARP form or to speak to a supervisor but was again refused, and he later submitted an ARP form reporting on the threat through Sgt. Tichi. On August 24, 2021, when he was reassigned to HU3, he told Officer Lark of the threat, but instead of taking steps to find another housing placement for Carter, Officer Lark told him that the only way to avoid going to HU3 was to refuse an order to move to HU3, accept a violation notice, and therefore be sent back to segregation. Prior to the August 25, 2021 assault, he again told Sgt. Lewis, Officer Robey, and a John Doe Officer about the threat but was not allowed to speak to a supervisor, was not provided an ARP, and was not moved to another housing unit. He further alleges that on August 25, 2021, Officer Robey and a John Doe Officer opened his cell door, and after he was assaulted by an inmate with a knife, looked the other way when he sought assistance. These allegations are sufficient to state an Eighth Amendment claim against

14

Sgt. Lewis, Officer Lavin, Officer Robey, and the John Doe Officer relating to the August 25, 2021 assault.

The Court, however, finds that the allegations do not state a valid Eighth Amendment claim against Lt. Davis, Lt. McKenzie, Sgt. Rice, Assistant Warden Butler, or ARP Coordinator Cartwright. Liability under 42 U.S.C. § 1983 attaches only upon personal participation by a defendant in the constitutional violation, or where the defendant otherwise condoned the violation. *Love-Lane v. Martin*, 355 F.3d 766, 782–83 (4th Cir. 2004). Absent personal participation, a supervisory official may be held liable upon a showing that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens such as the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practice; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Carter has not alleged facts showing that Lt. Davis or Lt. McKenzie was aware of his reports of a threat to his safety; rather, he complains that other Defendants prevented him from speaking to these two supervisors about the threat or submitting a written complaint about it through an ARP. There is no claim that either lieutenant received and reviewed ARP No. WCI-1377-21 before the assault occurred on August 25, 2021. Carter's assertion that Lt. McKenzie reviewed the video surveillance after the assault does not establish liability for a failure to protect him before the assault.

Similarly, the Amended Complaint includes no allegations against Sgt. Rice other than that he assisted in transporting Carter to the medical unit after the August 25, 2021 assault. Even if, as

15

Carter now asserts, Sgt. Rice was a supervisor of other Defendants, this lone allegation is insufficient to support a claim of supervisory liability because Carter has not asserted facts that would demonstrate that Sgt. Rice was aware of the threat to Carter's safety before the assault, or even that he observed the assault without intervening. Thus, Carter has not alleged facts supporting either personal liability or supervisory liability against Lt. Davis, Lt. McKenzie, or Sgt. Rice.

As for Assistant Warden Butler and ARP Coordinator Cartwright, there are no allegations that would support a finding they had any knowledge of any threat to Carter until after they received ARP No. WCI-1377-21, which was initially filed on August 17, 2021. According to the ARP form itself, Assistant Warden Butler did not sign it until September 7, 2021, after an investigation was completed, so the allegations do not support a finding that he had knowledge of the alleged threat before the assault on August 25, 2021. Although ARP Coordinator Cartwright signed the ARP on August 18, 2021 to acknowledge its receipt, that acknowledgment is not sufficient to support a claim against her where there is no allegation that she had any role in housing assignments or any knowledge that Carter, who was no longer in HU3 at the time that he submitted the ARP, would be reassigned back to HU3. The fact that the ARP was eventually denied does not support an Eighth Amendment claim against either Assistant Warden Butler or ARP Coordinator Cartwright. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (holding that a denial of a grievance, without more, does not establish personal participation under § 1983).

Accordingly, as to the Eighth Amendment claim in Count 2, the Court will grant the Motion and dismiss the claim as to Assistant Warden Butler, ARP Coordinator Cartwright, Lt. Davis, Lt. McKenzie, and Sgt. Rice but will deny the Moton as to the remaining Defendants.

### 2.    First Amendment

In Count 1, Carter asserts a First Amendment claim based on the failure by certain Defendants to provide him with ARP forms with which to submit a grievance relating to the threat against him and the failure to respond to his August 17, 2021 ARP until September 7, 2021, which was after the August 25, 2021 assault.  As discussed above, the alleged failure by certain Defendants to respond to verbal reports of a threat to Carter's safety and his request for ARP forms with which to report the threat are relevant to Carter's Eighth Amendment failure-to-protect claim. The Court does not find, however, that Carter has asserted a valid First Amendment claim based on these facts.

Generally, inmates "have no constitutional entitlement or due process interest in access to a grievance procedure," so they may not assert a § 1983 claim under the First Amendment alleging "denial of a specific grievance process."  *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 541 (4th Cir. 2017).  Thus, the alleged lack of access to ARP forms or to speak to certain supervisors does not alone establish a First Amendment claim.  Even if Carter's claim of repeated denials of his requests could implicate his constitutional rights, Carter has acknowledged in the Amended Complaint that he was able to file an ARP about the August 16, 2021 threat and assault on August 17, 2021, only one day later.  WCI officials, in fact, adjudicated the ARP, and there is no basis to claim that the fact that the decision was not reached until September 7, 2021, approximately 21 days later, violated Carter's First Amendment rights.  To the extent that prison officials, upon receiving the ARP, should have taken immediate steps to protect Carter, that issue is properly addressed through the Eighth Amendment claim, not a First Amendment claim.

### 3.    Fourteenth Amendment

In Count 3, Carter alleges violations of his rights to due process of law and equal protection of the law under the Fourteenth Amendment arising from the alleged failure to protect him from the assaults. As to due process, although Carter appears to allege a violation because he was deprived of "an opportunity to aggrieve the conditions of his confinement" and because his verbal and written alerts about the alleged threat were "ignored" and "delayed" until after he was stabbed on August 25, 2021, Am. Compl. at 13, Carter acknowledges in the Amended Complaint that he was able to submit an ARP on August 17, 2021 and that he received a ruling on it on September 7, 2021. Thus, even to the extent that there could be a due process claim arising from a failure to allow Carter to use the ARP process on this issue, he was, in fact, able to use it. Carter has provided no basis to support an argument that the failure to resolve his claim faster violated due process. To the extent that prison officials should have taken steps to protect him before the formal resolution of his ARP, that issue is properly addressed in relation to the Eighth Amendment failure-to-protect claim, not through a due process claim.

Although Carter also references "retaliatory tickets" in the context of due process, he has alleged insufficient facts to show how his due process rights were violated in relation to any violation notices he received or how they were adjudicated. *Id.* The First Amendment, however, protects a prisoner's right to be free from retaliation for filing a prison grievance. *See Booker*, 855 F.3d at 546. Such a claim requires a showing that the plaintiff (1) "engaged in protected First Amendment activity"; (2) the defendant "took some action that adversely affected [the plaintiff's] First Amendment rights; and (3) "there was a causal relationship between [the] protected activity" and the defendant's conduct. *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020). Filing a prison grievance satisfied the first prong. *See Jones v. Solomon,* 90 F.4th 198, 213 (4th Cir. 2024).

18

However, although Carter has generally alleged that the ticket for fighting issued by Sgt. Lewis and Officer Lavin on August 17, 2021 was retaliatory, he did not actually deny that he was involved in a fight and instead acknowledged that he had marks on his body "consistent with an assault"; indeed, the Amended Complaint includes no specific facts about that ticket or the underlying incident, and none that would show that Carter was not actually involved in a fight that day. Am. Compl. at 7. While he also asserts that Lt. McKenzie issued him a ticket after watching the surveillance video relating to the August 25, 2021 incident, he has alleged no facts showing that, up to that point, Lt. McKenzie had any knowledge of his filing of an ARP or otherwise registering a complaint of some kind. Thus, any First Amendment claim of retaliation for filing a complaint will be dismissed based on the lack of sufficient allegations to support the claim.

As for Carter's equal protection claim, the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985) (citation omitted). A plaintiff asserting an equal protection claim must allege "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Here, Carter has alleged no facts showing that he was treated differently under similar circumstances as compared to members of some other group of inmates. The Court will therefore dismiss the equal protection claim.

### C.     Counts 4-7: Property Claims

In Counts 4-7, Carter asserts claims under the First, Fifth, Eighth, and Fourteenth Amendments based on the loss of some of his personal property after he was sent out of the prison for medical treatment after the August 25, 2021 assault. A claim for deprivation of property by

19

prison officials could only potentially arise under the Due Process Clause of the Fifth and Fourteenth Amendments. Although Carter asserts such a claim in Count 5, the United States Supreme Court has held that either an intentional or negligent deprivation of property by a prison official does not implicate the Due Process Clause if there is a meaningful post-deprivation remedy available. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Generally, the right to seek damages and injunctive relief in Maryland courts in a tort action constitutes an adequate post-deprivation remedy for inmates in Maryland prisons. *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982) ("[T]here is no question that the relief available to plaintiff in state court is adequate."). Specifically, for a claim of lost property, judges in this District have held that the Maryland Tort Claims Act ("MTCA") provides an adequate post-deprivation remedy. *See Hawes v. Foxwell*, No. DKC-17-2598, 2018 WL 2389060, at *4 (D. Md. May 25, 2018) (finding that the MTCA and the IGO provided adequate post-deprivation remedies for an inmate who had personal items and legal documents lost after a search of his cell); *Fuller v. Warden*, No. WMN-12-43, 2012 WL 831936, at *2 (D. Md. Mar. 8, 2012) (finding that the MTCA provided an adequate post-deprivation remedy for a prisoner who alleged that his personal property in his cell, including legal materials, was improperly confiscated or lost when he was moved to segregation); *Resper v. Schurg*, No. PJM-13-1278, 2014 WL 3345131, at *2 & n.2 (D. Md. July 7, 2014) (finding that the MTCA and IGO provided adequate post-deprivation remedies for an inmate who alleged that correctional personnel improperly withdrew funds from his prison account). Maryland state inmates may sue correctional officers and other prison officials in tort actions in Maryland courts, subject to the requirements and restrictions of the MTCA and principles of immunity. *See, e.g.*, *Cooper v. Rodriguez*, 118 A.3d 829, 848, 860 (Md. 2015) (holding that a prison official could be liable under the MTCA for acts involving gross negligence).

20

Here, Carter has acknowledged that he has been able to pursue an administrative claim based on the deprivation of his property up to the IGO, and that he has received judicial review of that claim by a Maryland Circuit Court. Although he has asserted that Defendants took actions to inhibit his property claim, such arguments could have been asserted in the administrative and state court proceedings. Where Carter has access to an adequate post-deprivation process for inmate property claims, and in fact has pursued such a process, Carter's Fifth and Fourteenth Amendment claims based on the loss of his personal property do not state a plausible claim for relief. *See Hawes*, 2018 WL 2389060, at *4 (dismissing an inmate's property loss claim for failure to state a cognizable constitutional claim); *Fuller v. Horning*, No. WMN-11-1917, 2012 WL 2342947, at *7 (D. Md. June 19, 2012) (stating that "removal of property from a prisoner simply does not state a constitutional claim"), *aff'd*, 504 F. App'x 218 (4th Cir. 2013); *Young-Bey v. Miller*, No. JKB-16-3435, 2018 WL 4108076, at *4 (D. Md. Aug. 29, 2018) (holding that a claim that personal property was destroyed did not assert a constitutional violation).

As for the remaining claims based on the loss of personal property, the First Amendment claim in Count 4 fails because Carter has articulated no basis upon which to find that a deprivation of property implicates the First Amendment. To the extent that, construed liberally, the allegations could be deemed to allege that the loss of property or property receipts was a form of retaliation for Carter's filing of an ARP in this case, Carter has alleged no facts supporting such a claim. Notably, there are no allegations that Lt. McKenzie, alleged to have supervised the handling of Carter's property, ever received the ARP by Carter relating to the security threats. There are no facts alleged that would support any plausible connection between the filing of the ARP relating to the threat to Carter's safety and any actions by Assistant Warden Butler or ARP Coordinator Cartwright relating to the property receipts. *See Constantine v. Rectors & Visitors of George*

21

*Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (holding in part that a plaintiff must demonstrate a causal connection between First Amendment activity and the alleged retaliatory action). The First Amendment claim in Count 4 will therefore be dismissed.

As to the Eighth Amendment claim in Count 6, Carter has not shown how the loss of the listed items of personal property could constitute cruel and unusual punishment, and the Court is unaware of any precedent supporting such a claim. Finally, as for the claim in Count 7 based on the Equal Protection Clause of the Fourteenth Amendment, as with the equal protection claim in Count 3, Carter has not alleged facts showing that he was subjected to discriminatory treatment as compared to some other class of inmates that could support an equal protection claim. *See supra* part II.B.3. The claims in Counts 4-7 relating to the loss of property will therefore be dismissed.

## III.    Qualified Immunity

Defendants also seek dismissal based on qualified immunity. Government officials sued in their individual capacities may invoke qualified immunity. *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013). "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999)). To overcome an assertion of qualified immunity from a § 1983 claim, a plaintiff must show that (1) the government official violated a federally protected right of the plaintiff; and (2) that right was clearly established at the time of the alleged misconduct, in that a "reasonable official would understand that what he is doing violates that right." *Id.* Because one of the purposes of qualified immunity is to "protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government,'" the Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of

22

a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (citations omitted). If the Court determines that the government official took actions that a reasonable officer could have believed were lawful, then the official is entitled to dismissal before discovery. *Id.*

The only remaining claims are the Eighth Amendment failure-to-protect claims against Sgt. Lewis, Officers Most, Greise, Lavin, Lark, and Robey, and the J. Doe Officers. Where the Court has found the allegations sufficient to state such a claim as to these Defendants, the issue is whether the right at issue was clearly established. At the time of the events at issue here, it was clearly established that the Eighth Amendment requires that if an inmate is known to face a risk of physical harm from another inmate, a correctional officer must act to separate the inmate from the threat. *See Cox*, 828 F.3d at 237–38 (affirming the denial of qualified immunity to correctional officers on an Eighth Amendment failure-to-protect claim where the prisoner repeatedly informed them that he feared for his safety, but the defendants failed to take reasonable action before he was beaten). Taking the allegations as true, as is required at this stage of the case, these Defendants were made aware of a safety threat to Carter in HU3, but none acted to either remove him from that unit, to remove the potentially threatening inmates, or to report the threat to others with more direct responsibility for addressing such circumstances. Thus, at this stage of the case, the Court will not dismiss the Eighth Amendment failure-to-protect claims based on qualified immunity.

## IV.    Carter's Remaining Motions

Carter has also filed a Motion to Renew and Serve the Complaint on Unrepresented Defendants, a Motion to Compel Defendants to Comply with Rule 5, and a Motion for Appointment of Counsel. Carter's Motion to Renew and Serve the Complaint on Unrepresented Defendants will be denied as moot because where Defendants' Motion was filed on behalf of all defendants, including the three allegedly unserved defendants, the Court deems defense counsel

to have accepted service on behalf of ARP Coordinator Carter, Lt. McKenzie, and Officer Lavin. *See* ECF No. 11.

The Motion to Compel Defendants to Comply with Rule 5, in which Carter alleges that defense counsel did not serve him with copies of their notices of appearance and motions for extensions of time, will be granted in that Defendants will be directed to comply with Federal Rule of Civil Procedure 5 by serving Carter with copies of future filings in this case. *See* Fed. R. Civ. P. 5(a)(1), (b)(2). Where Carter has stated that he received copies of prior filings from the Clerk of the Court, Defendants need not send additional copies of those filings. At this time, the Court will not grant Carter's request that it impose a prospective sanction for any future violations.

Finally, where Defendants' Motion will be denied in part and this case will proceed to discovery, the Motion for Appointment of Counsel will be granted because as an incarcerated party, Carter would be unable to engage in discovery effectively without the assistance of counsel.

## CONCLUSION

For the foregoing reasons, Carter's Motion for a Preliminary Injunction will be DENIED, and Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, construed as a Motion to Dismiss, will be GRANTED IN PART and DENIED IN PART. Specifically, the Motion will be granted as to Counts 1, 3, 4, 5, 6, and 7, and as to the claims against Assistant Warden Butler, ARP Coordinator Cartwright, Lt. Davis, Lt. McKenzie, and Sgt. Rice asserted in Count 2. The Motion will be otherwise denied.

In addition, Defendants' Motion for an Extension of Time will be GRANTED, Carter's Motion to Renew and Serve the Complaint on Unrepresented Defendants will be DISMISSED AS MOOT, Carter's Motion to Compel Defendants to Comply with Rule 5 will be GRANTED, and Carter's Motion for Appointment of Counsel will be GRANTED. A separate Order shall issue.

Date:  September 29, 2025



THEODORE D. CHUANG
United States District Judge